UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X
                             :

S.E., individually and on behalf  :    14 Civ. 4163 (LAP)
of her minor child G.E.,        :

                             :    OPINION & ORDER

         Plaintiff,         :

                             :

         v.                 :

                             :

NEW YORK CITY DEPARTMENT OF     :
EDUCATION, and CARMEN FARIÑA, in  :
her official capacity as        :
Chancellor of the New York School :
District,                  :

                             :

         Defendants.        :

                             :
------------------------------------X

LORETTA A. PRESKA, Chief United States District Judge:

      Plaintiff S.E., on behalf of her minor child, brings
this action against the New York City Department of Education
(the "DOE") pursuant to the Individuals with Disabilities
Education Act (the "IDEA"), 20 U.S.C. §§ 1400, et seq., and
Article 89 of the New York State Education Law, N.Y. Educ. L.
§ 4401 et seq., seeking reversal of the January 23, 2014
decision of the Impartial Hearing Officer ("IHO") and the April
18, 2014 decision of the State Review Officer ("SRO"), both
denying private school tuition funding for her minor daughter,
G.E.  Both parties now move for summary judgment.  For the
following reasons, the Court GRANTS Defendants' motion [dkt. no.
20] and DENIES Plaintiff's motion [dkt. no. 14].

I.    STATUTORY FRAMEWORK

        Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs ... [and] to ensure that the rights of children with disabilities and parents of such children are protected."  20 U.S.C. § 1400(d)(1)(A)-(B); see also Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007).  States receiving federal funds under the IDEA are required to provide a free appropriate public education ("FAPE") to all children with disabilities.  Id. § 1412(a)(1)(A); see also Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003).  A FAPE should "emphasize[] special education and related services designed to meet [a disabled child's] unique needs and prepare [the child] for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  To this end, the IDEA requires that the relevant local or state educational agency provide an individualized education program ("IEP") at least annually for each disabled student.  Id. § 1414(d)(2)(A).

        An IEP is a written statement that "sets out the child's present educational performance, establishes annual short-term objectives for improvements in that performance, and

2

describes the specially designed instruction and services that will enable the child to meet those objectives." Honig v. Doe, 484 U.S. 305, 311; see also 20 U.S.C. § 1414(d)(1)(A). For a child's IEP to be adequate under the IDEA, it must be "likely to produce progress, not regression, and [must] ... afford[] the student with an opportunity greater than mere trivial advancement." T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 254 (2d Cir. 2009) (internal citation omitted). However, it need "not ... furnish every special service necessary to maximize each handicapped child's potential." Grim, 346 F.3d at 379 (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 199 (1982)). Put differently: an IEP is adequate if it offers a "basic floor of opportunity." Rowley, 458 U.S. at 189-90. The IEP is "[t]he centerpiece of the [IDEA]'s educational delivery system." Honig, 484 U.S. at 311.

In New York State, the formulation of an IEP is delegated to a local Committee on Special Education ("CSE"), consisting of school board representatives, educators, clinicians, and parents. N.Y. Educ. L. § 4402. "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." Gagliardo, 489 F.3d at 107-08 (internal citation omitted). A parent is a "member" of the CSE

that formulates his or her child's IEP, N.Y. Educ. L. § 4402(b), and the IDEA requires that he or she be provided an opportunity to present complaints with respect to the identification, evaluation, or placement of his or her child during the IEP process.  20 U.S.C. § 1415(b)(6)(A).

The IEP need not name a specific school placement for the child.  J.W. ex rel. Jake W. v. N.Y.C. Dep't of Educ., No. 13-CV-6905 (JPO), 2015 WL 1399842, at *2 (S.D.N.Y. Mar. 27, 2015)(citing T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 419 (2d Cir. 2009)).  The DOE's practice "is to provide general placement information in the IEP, such as the staffing ratio and related services, and then convey to the parents a final notice of recommendation ... identifying a specific school at a later date.  The parents are then able to visit the placement before deciding whether to accept it."  Id. (quoting R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 191 (2d Cir. 2012)).

A parent dissatisfied with a school district's recommended program may unilaterally place his or her child in a private school and then seek retroactive tuition reimbursement from the school district.  20 U.S.C. § 1412(a)(10)(C); Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005).  See also Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 (1985) ("Burlington"); Florence Cnty. Sch. Dist. Four v.

Carter ex rel. Carter, 510 U.S. 7 (1993) ("Carter").  To determine whether a parent is entitled to reimbursement, a court applies the three-pronged Burlington/Carter test, "which looks to (1) whether the school district's proposed plan will provide the child with a [FAPE]; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities."  J.W., 2015 WL 1399842, at *2 (quoting C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 73 (2d Cir. 2014)).

If a parent in New York "believe[s] an IEP is insufficient under the IDEA," he or she "may challenge it in an 'impartial due process hearing,' 20 U.S.C. § 1415(f), before an [IHO] appointed by the local board of education." Grim, 346 F.3d at 379 (quoting N.Y. Educ. L. § 4404(1)).  At the hearing before the IHO, "the school district has the burden of demonstrating the appropriateness of its proposed IEP." Id.  An IHO's decision may, in turn, be appealed to a SRO, who is an officer of the State's Department of Education.  Id. at 379-80. A party "aggrieved" by the findings of the SRO "shall have the right to bring a civil action" in either state or federal court. 20 U.S.C. § 1415(i)(2)(A).

II.   BACKGROUND

   A. Factual Background

      1.     G.E.'s Disability

         G.E. is a nine-year-old New York City resident classified with autism by the New York City Department of Education ("DOE").  (Ex. B:1; Tr. 107.)[1]  G.E. has significant cognitive deficits, delays at her fine and gross motor development, and behavioral issues, including becoming frustrated easily and singing loudly as a coping mechanism. (Ex. B:1-4.)  With the exception of five weeks in 2010 when G.E. attended a DOE school, G.E. has attended Seton every year since kindergarten during the 2009-2010 school year.  (Ex. L:3; Tr. 120-21.)  It is undisputed that G.E. had an eligible disability during the 2013-2014, twelve-month school year (beginning in July 2013), entitling her to special education services and supports to provide her with a FAPE.

---

[1] For references to the underlying administrative record, the Court follows the citation convention employed by the parties in their briefing.  Citations in the form of "Ex. __" are to exhibits from the underlying administrative hearing before the IHO.  Exhibits preceded by alphabetical reference were introduced by Plaintiff during this hearing, while exhibits identified by numerical reference were introduced by the DOE.  Citations in the form of "Tr. __" are to pages from the transcript of the hearing before the IHO.  Plaintiff filed a complete copy of the underlying administrative record with the Court under seal on December 8, 2014.  (See [dkt. no. 11].)

2.   <u>Individualized Education Program</u>

On May 17, 2013, the DOE convened a CSE meeting to formulate an IEP for G.E. for the 2013-2014 school year.  (<u>See</u> Ex. B.)  Attending the meeting were Plaintiff, Plaintiff's counsel, a Seton teacher, and various DOE educators.  (<u>Id.</u> at 17.)  The meeting resulted in an IEP for G.E. for the 2013-2014 school year (the "May 2013 IEP" or the "IEP").

After a thorough review of G.E.'s then-current academic, social, and physical development (<u>see</u> <u>id.</u> at 1-5), the May 2013 IEP makes a number of recommendations as part of G.E.'s special education program.  The IEP calls for: (a) enrollment in a twelve-month program in a special education class with a ratio of up to six students to one special education teacher and one classroom professional ("6:1:1"); (b) five thirty-five minute adapted physical education sessions per week; (c) one thirty-minute counseling services session per week; (d) one thirty-minute individual and two thirty-minute group occupational therapy sessions per week; (e) two forty-five minute parent counseling and training sessions per year; (f) one thirty-minute physical therapy session per week; (g) one sixty-minute individual, one thirty-minute individual, and two thirty-minute group speech-language ("S/L") therapy sessions per week (with (c)-(f), the "related services").  (<u>Id.</u> at 12-13.)

The IEP contains numerous goals and short-term objectives for G.E. to meet in her 6:1:1 class and related service therapies.  (Id. at 6-11.)  It also recommends strategies for successful implementation of the special education program; specifically, the IEP notes that "[G.E.] requires a structured classroom environment free of external and extraneous stimuli, a higher teacher to student ratio[], prompting, redirection, token economy, and visual benefits." (Id. at 5.)  Finally, though not specifically recommending any interaction with non-disabled peers, the IEP states that, "[w]ith appropriate adult supervision, [G.E.] is able to participate in extracurricular and other nonacademic activities with typically developing peers."  (Id. at 14.)  Plaintiff did not, and does not, challenge the May 2013 IEP.

### 3.   Placement

In June 2013, following the CSE meeting and resultant IEP, Plaintiff received from the DOE three separate documents purporting to be a Final Notice of Recommendation ("FNR").  (See Tr. 109.)  The first two FNRs were sent by the DOE in error.[2]

---

[2] The first FNR, received June 10, 2013, offered an incorrect placement site (Ex. C; Tr. 109); the second FNR, received June 15, 2013, extended school year services for July and August only at another site (Ex. E).  During this period, Plaintiff corresponded with the DOE regarding placement options and continuing services for her daughter.  (Ex. D.)

Plaintiff received the final, corrected FNR on June 13, 2013. (Ex. F. (the "FNR").)  The FNR provided for G.E.'s placement in a specialized 6:1:1 class at P373 at P.S. 40, 91 Henderson Avenue, Staten Island, NY ("P.S. 373").[3]

        P.S. 373 is a self-contained specialized school.  (See Tr. 30.)  For the 2013-2014 school year, P.S. 373 had thirteen classes, all of which are 6:1:1 special education classes.  (Id. at 19, 38.)  Each of P.S. 373's teachers has a master's degree in special education.  (Id. at 29.)  P.S. 373 provides its students with S/L therapy, occupational therapy, physical therapy, and counseling, as recommended in each student's IEP. (Id. at 19.)  The school typically uses DOE employees to conduct the recommended related service therapies for each student but, when needed, uses contractor therapists to meet demands.  (Id. at 19-20.)

        P.S. 373 has two separate rooms designated for related service therapies.  (Id. at 38-39, 41.)  The first room is

_____

[3] P.S. 373 has multiple locations.  (See Tr. 18-19, 23.)  These include two buildings on Henderson Avenue in Staten Island.  The large building, referred to in the transcript as the "main building," houses special education classes for students with emotional behavioral issues.  (Id. at 19.)  The smaller "mini building," which is located next to the main building, houses special education classes for students who have autism classifications.  (Id. at 19, 41.)  G.E. was recommended a placement in the mini building.  (Id. at 23.)  Hereinafter, "P.S. 373," the "proposed placement," the "assigned site," etc., refer only to the mini building site.

designed for S/L therapy, which has partitions for privacy
during sessions.  (Id. at 41.)   The second room is used for
occupational therapy ("OT") and physical therapy ("PT").   (Id.
at 38-39.)   This room fits four or five therapists at a time and
contains some partitions for privacy during sessions.  (Id. at
39.)   In addition to the OT/PT room, the therapists often
utilize other areas of the school as needed (hallway,
schoolyard, playground, etc.).  (Id. at 40.)

Plaintiff visited the assigned site on June 21, 2013.
(Ex. G:1; Tr. 112.)   During her visit, Maria Gambino-Dinneny
("Gambino-Dinneny"), an assistant principal and site supervisor
for P.S. 373, showed Plaintiff the school.  (Ex. G:1; Tr. 114.)
Plaintiff was shown a kindergarten class, fourth grade class,
and the related services room.  (Ex. G:1; Tr. 113-15.)
Plaintiff also observed the cafeteria, hallways, and other
common areas in the school.  (Tr. 128-29.)   P.S. 373 was not
able to identify which class G.E. would be assigned to and,
accordingly, Plaintiff was unable to view the actual class G.E.
would be sitting in.  (Id. at 114.)

During Plaintiff's visit, she discussed G.E.'s IEP-
mandated related services with Gambino-Dinneny.  (Id. at 37,
115.)   Both Plaintiff and Gambino-Dinneny were aware that the
May 2013 IEP mandated numerous S/L sessions per week; further,

both Plaintiff and Defendants agree that G.E.'s related services
mandate would be fulfilled, either on-site at the assigned
placement or off-site by contractors.  (Id. at 37-38, 116.)

However, based on a conversation between Plaintiff and
Gambino-Dinneny during the June 21, 2013 visit, Plaintiff and
Defendants offer somewhat divergent interpretations of the
manner in which G.E. would have received the May 2013 IEP-
mandated related services.  Gambino-Dinneny's testimony is that
P.S. 373 would meet the related services mandate, specifically
the S/L therapy, either on-site or through related services
authorizations ("RSAs"), which would allow Plaintiff to contract
with an outside therapist to schedule the remaining session—not
during school hours—at the DOE's expense.  (Id.)  According to
Gambino-Dinneny, issuance of RSAs seemed likely in G.E.'s case
given the number of S/L therapy sessions recommended by the May
2013 IEP.  Even so, Gambino-Dinneny testified, if Plaintiff
objected to the RSAs, P.S. 373 would have found a way to
accommodate the mandated therapy sessions within the school, and
to provide the recommended related services.  (Id. at 37-38.)
Plaintiff's testimony is that, given the number of S/L therapy
sessions mandated by the May 2013 IEP, she interpreted Gambino-
Dinneny's statements to mean that "if [G.E.] was receiving more
than two sessions in a related services area like speech or
[occupational therapy], [Plaintiff] would be responsible to go

11

outside school and schedule those sessions, that they would not
be able to be met during the school day." (Id. at 115.)
Plaintiff testified that RSAs would present "an issue" for her
because such off-site therapy would extend G.E.'s school day,
and Plaintiff would be responsible for contracting, planning,
and transportation. (Id. at 116.)  As to Gambino-Dinneny's
assertion that P.S. 373 could have provided the May 2013 IEP-
required therapy and related services on-site if Plaintiff
rejected RSAs, Plaintiff testified "No, that was not explained
to me.  It was explained that I would be responsible for
scheduling the sessions.  I would be given an RSA if it could
not ... be met at school." (Id. at 116.)

     During the visit, Plaintiff also learned that the
assigned site at P.S. 373 did not offer opportunities for
G.E. to interact with typically developing peers, which
Plaintiff felt was critical to G.E.'s development. (Id. at
117-18.)  Plaintiff testified that, in her discussion with
Gambino-Dinneny, she learned there were other programs that
could offer inclusion opportunities for G.E., but that the
offered placement was not one of them. (Id. at 117.)

     Along with testimony regarding the planned
implementation of G.E.'s therapy and related services, Plaintiff
and Gambino-Dinneny offered testimony regarding whether the

12

assigned placement at P.S. 373 was an "appropriate" placement

for G.E.   On counsel's direct examination of Plaintiff,

Plaintiff testified:

> MS. ISAACS:  Did you have an opportunity to discuss
> [G.E.]'s learning style and personality with [Gambino-
> Dinneny] at your visit?
>
> [PLAINTIFF]:  I did.  Once—right after we discussed
> related services, she wanted me to describe what type
> of child [G.E.] was, so I described her personality,
> her learning level, what her interests were, what she
> liked to do, what she was currently doing, and what I
> wanted her to achieve in the year coming, and when I
> described [G.E.] to her, she told me that she didn't
> feel that the program that was at [P.S. 373] was
> appropriate for [G.E.].
>
> MS. ISAACS: Did she make any recommendations or
> suggestions to you when she told you she didn't think
> the school was right?
>
> [PLAINTIFF]:  She didn't.  No.  She did say that there
> were other programs that would be more appropriate for
> her, but they were not at this location.

(Id. at 116-17.)  Assistant Principal Gambino-Dinneny

offered a different recollection:

> MS. ISAACS:  [Plaintiff] remembers discussing
> alternate sites with you, after she felt that your
> school could not offer support for [G.E.], appropriate
> support for [G.E.].  Do you remember that at all?
>
> MS. GAMBINO-DINNENY:  No.  I don't know what you mean
> by alternate sites.
>
> MS. ISAACS:  We were talking before about if a parent
> objected to the site as being too restrictive.
>
> Ms. GAMBINO-DINNENY:  Oh, okay.  You mean like our
> locator sites, something other than the mini building?
>
> MS. ISAACS: Yes.

MS. GAMBINO-DINNENY: Okay.  All right.  I don't
remember that conversation with her specifically, but
it could happen.

(Id. at 44-45.)

Gambino-Dinneny also provided additional
testimony on the topic of "co-located sites."  P.S. 373 has
multiple locations (see supra n.3), and Gambino-Dinneny
testified that, "If a parent expresses ... interest[] in a
co-located site, what we have done is, we know where we
have openings in our programs, in our classes and then what
we could do is call placement, the placement office for
District 75 and confirm with them that we have this opening
and that a parent is interested."  (Tr. 33.)  Gambino-
Dinneny confirmed this would be the case if,
hypothetically, a parent expressed an objection to the site
at P.S. 373 and was interested in looking at another site.
(Id.)  However, and regardless of what Gambino-Dinneny
knows or any opening that might exist, "the final decision
is made by placement."  (Id. at 34.)

On June 28, 2013, Plaintiff unilaterally enrolled
G.E. at Seton for the 2013-2014 school year.  (Ex. L.)

14

B. Procedural Background

      Shortly thereafter, on July 12, 2013, Plaintiff, through counsel, filed a Due Process Complaint ("DPC") seeking funding for the cost of tuition at Seton during the 2013-2014 school year.  (Ex. A.)  In the DPC, Plaintiff outlined the reasons she believed P.S. 373 was an inappropriate placement for G.E.  (See id. at 1.)[4]  The DPC alleged that the "proposed public placement was not reasonably calculated to satisfy the mandates of [G.E.]'s IEP, and would not be reasonably likely to be an environment in which [G.E.] could make meaningful education progress."  (Id. at 3.)  Plaintiff requested reimbursement for "placement at [Seton] for the 2013-2014 school year in the amount of $36,000" and "related services and transportation provided by the DOE."  (Id.)

---

[4] The DPC restates the reasons Plaintiff provided in her June 24, 2013 letter to Amine Haddad, a member of CSE 7, District 231, following her visit to P.S. 373.  The June 24 letter (and DPC) enumerated several reasons for Plaintiff's determination including, among others, that: "the school is cramped, crowded and distracting ... [and G.E.] is highly distractible, and requires a controlled, structured environment in which to learn"; the cafeteria was "loud, disorganized and chaotic"; Plaintiff did not have the opportunity to view the specific classroom in which G.E. would be placed; and that not all of G.E.'s related services would be available during the school day.  (See Ex. G.)

1.    IHO Hearing

A two-day hearing was held before the IHO on October 25, 2013 and January 10, 2014.  (IHO Findings of Fact and Decision, dated January 23, 2014 (the "IHO Decision").)  During the hearing, the DOE presented one witness, Gambino-Dinneny, while Plaintiff testified herself and also called Diane Taranto, director of the elementary program at Seton.

On January 23, 2014, the IHO issued his Decision, concluding that the DOE had offered G.E. a FAPE for the 2013-2014 school year and therefore did not reach any further issues. (Id. at 13.)  In arriving at this decision, the IHO evaluated and rejected Plaintiff's specific arguments.  In particular, the IHO found that there was no procedural or substantive defect that rose to the level of denying G.E. a FAPE and rejected Plaintiff's allegation that placement at P.S. 373 failed to meet the least restrictive environment ("LRE") standard.  (Id. at 9-13.)

Plaintiff alleged both procedural and substantive defects.  Beginning with the former, Plaintiff asserted that G.E.'s placement was procedurally defective due to the DOE's (1) initially sending an incorrect FNR form, correcting it, and notifying Plaintiff two days later, and (2) being unable to allow Plaintiff to view the specific class recommended.

16

(Id. at 9.)  The IHO found that each of these procedural flaws, "to the extent it was a defect at all, was de minimis and did not rise to the level of having denied the child FAPE."  (Id. at 9-10.)  With respect to G.E.'s placement at P.S. 373, the IHO found Plaintiff's argument that P.S. 373 did not meet the "LRE" requirement because it did not provide an adequate amount of contact with "typically developing peers" was "too speculative on which to base any finding of violation of LRE."  (Id. at 10-11.)  Finally, after reviewing alleged substantive defects in the proposed placement listed by Plaintiff in the DPC, the IHO concluded that the DOE "having demonstrated that it had available a seat in a self-contained class in a self-contained school that could deliver the ... program as described in [G.E.]'s IEP, [Plaintiff] has not raised, much less proven by testimony or evidence, objections to that placement that amount to a recognizable legal harm."  (Id. at 13.)

2.   SRO Decision

Thereafter, Plaintiff appealed the IHO's decision to the SRO.  In a decision dated December 18, 2014, the SRO found that, although the DOE failed to honor the LRE requirement, the DOE nonetheless offered G.E. a FAPE for the 2013-2014 school year.  (State Education Dep't Review Officer Decision ("SRO Decision") at 17.)  That decision is seventeen, single-spaced pages and cites extensively to both documentary evidence and the hearing transcript.  (Id. passim.)

The SRO's analysis began by addressing Plaintiff's challenge to the assigned public school site, P.S. 373, with a particular emphasis on Plaintiff's argument that the IHO's analysis of that issue was "legally flawed and that the district could not have properly implemented the student's May 2013 IEP." (SRO Decision at 9.)  After reviewing relevant case law in this Circuit (and District), the SRO found Plaintiff's argument to be "speculative" because G.E. never attended P.S. 373 and "a retrospective analysis of how the district would have executed the student's May 2013 IEP at the assigned public school site is not an appropriate inquiry under the circumstances of this case."  (Id. at 9.)  Accordingly, the SRO determined that Plaintiff could not prevail on her claim that the assigned

public school site would not have properly implemented the IEP.
(Id. at 11.)

Despite the initial finding that Plaintiff's
allegations were legally insufficient—and therefore failed as a
threshold matter—because they were "speculative," the SRO
nevertheless engaged in the hypothetical exercise of determining
whether G.E. would have been denied a FAPE had she accepted the
DOE's assigned placement at P.S. 373.  The SRO considered each
of Plaintiff's arguments, based on related services (id. at 11-
12), sensory needs (id. at 13), and LRE (id. at 13-16).  Finding
those arguments unavailing as well, the SRO determined that the
DOE offered G.E. a FAPE for the 2013-14 school year and there
was no need to reach any further issue.  (Id. at 16-17.)

III. LEGAL STANDARD

Although the parties have styled their submissions as motions for summary judgment, "the procedure [in IDEA actions] is in substance an appeal from an administrative decision, not a summary judgment." Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005)(internal citation omitted). Summary judgment thus "serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in [the] IDEA." Id. Accordingly, deciding a motion for summary judgment in an IDEA action "often triggers more than an inquiry into possible disputed facts." Id. The inquiry is directed at "whether the administrative record, together with any additional evidence, establishes that there has been compliance with the IDEA's processes and that the child's educational needs have been appropriately addressed." D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ., 950 F.Supp.2d 494, 498 n.1 (S.D.N.Y. 2013)(internal citations omitted).

Specifically, under the IDEA, "a district court must conduct an independent review of the administrative record, along with any additional evidence presented by the parties, and must determine by a preponderance of the evidence whether the IDEA's provisions have been met." Id. at 498 (citing Grim, 346 F.3d at 380-81); see also 20 U.S.C. § 1415(i)(2)(C) (stating

that a federal court reviewing administrative proceedings under the IDEA "shall receive the records of the administrative proceedings," "shall hear additional evidence at the request of a party," and, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate").

Even so, it is well established that "[T]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." Gagliardo, 489 F.3d at 112 (internal quotation marks omitted); see also Grim, 346 F.3d at 380-81 (interpreting the IDEA as "strictly limiting judicial review of state administrative decisions"). Courts "must engage in an independent review of the administrative record and make a determination based a 'preponderance of the evidence'" but "must give 'due weight' to [the administrative] proceedings, mindful that the judiciary 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Id. at 113 (quoting Rowley, 458 U.S. at 206, 208); see also M.H. v. N.Y.C. Dep't of Ed., 685 F.3d 217, 225 (2d Cir. 2012). Summary judgment in an IDEA action is not license for a district court to "substitute [its] own notion[] of sound educational policy for those of the school authorities which [it] review[s]." Rowley, 458 U.S. at 206. "As the Supreme Court made clear in Rowley, the purpose of the

IDEA is to provide funding to states so that they can provide a decent education for disabled students consistent with their traditional role in educating their residents." M.H., 685 F.3d at 244 (internal citations omitted).

All this is to say that, "in policing the states' adjudication of IDEA matters, the courts are required ... [to] determin[e] the 'weight due' any particular administrative finding." Id. In general, a district court's deference to an administrative officer's decision "will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." A.M. ex rel. Y.N. v. N.Y.C. Dep't of Educ., 964 F.Supp.2d 270, 277-78 (S.D.N.Y. Aug. 9, 2014) (quoting M.H., 685 F.3d at 244). Recognizing the difficulty in applying this standard, the Court of Appeals elaborated:

By way of illustration, determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures. Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress. Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not. And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

M.H., 685 F.3d at 244.

In sum, "judicial review of administrative decisions under the IDEA requires the court (1) to conduct an independent review of the administrative record, (2) use a preponderance of the evidence standard, and (3) give deference to the administrative determinations, particularly that of the SRO." J.W., 2015 WL 1399842, at *7 (quoting F.L. ex rel. F.L. v. N.Y.C. Dep't of Educ., No. 11 Civ. 5131(RKE), 2012 WL 4891748, at *5 (S.D.N.Y. Oct. 16, 2012), aff'd, 553 Fed.Appx. 2 (2d Cir. 2014) (summary order)).

IV.   DISCUSSION

This case is in the minority of actions brought under the IDEA in that Plaintiff does not challenge the IEP.  Rather, Plaintiff's only challenge is to G.E.'s assigned placement at P.S. 373.  Plaintiff's argument proceeds from the premise that G.E. was denied a FAPE for the 2013-14 school year because P.S. 373 would not have been able to implement the May 2013 IEP. Plaintiff makes three arguments in support of her assertion: at least some of G.E.'s related services would have had to be completed off-site, through RSAs; the assigned site was not a suitable setting for G.E.; and that the IEP did not meet the LRE requirement because the assigned placement would not allow G.E. to interact with non-disabled peers.  In response, the DOE asserts that this Court should defer to the IHO and SRO decisions and, echoing those decisions, that Plaintiff's claims that the assigned placement could not appropriately implement the IEP are "speculative"; moreover, even if those claims are not speculative, the DOE argues the assigned placement was appropriate.

A. Evaluating Appropriateness of the Placement

"The case law regarding challenges to a school's ability to provide a FAPE is less than a model of clarity." N.S. v. N.Y.C. Dep't of Educ., No. 13 Civ. 7819(VEC), 2014 WL 2722967, at *12 (S.D.N.Y. June 16, 2014). Nevertheless, courts have provided several guideposts for conducting the inquiry. See generally, J.W., 2015 WL 1399842, at *8; N.S., 2014 WL 2722967, at *12 (summarizing the law on this topic). First, a school district is not required to designate a specific school in an IEP. T.Y. v. N.Y. City Dep't of Educ., 584 F.3d 412, 420 (2d Cir. 2009). That said, "school districts are not permitted to assign a child to a school that cannot satisfy the IEP's requirements." N.S., 2014 WL 2722967, at *12; see also, T.Y., 584 F.3d at 420 ("We emphasize that we are not holding that school districts have carte blanche to assign a child to a school that cannot satisfy the IEP's requirements."). Finally, "where parents do not object to the IEP and have not enrolled their child in the proposed placement, the burden is on the parents to establish that the school district would not have adhered to the written plan." N.S. 2014 WL 2722967, at *2. This is a high bar: "[t]here should be few circumstances, however, in which parents can, if there is an adequate IEP, successfully challenge a placement if their child never attended the school." Id. at *12.

Determining whether a situation qualifies as one of those "few circumstances" is something of a two-layered process. First, courts look for "hard evidence that the school would not or could not develop a FAPE." Id. at *13 ("[I]f a school is factually incapable of providing a FAPE to a student, the student's parents need not subject their child to that placement.")  There are few instances in which courts have found this sort of factual prerequisite present.  In these cases, there was an obvious, untenable conflict between the child's IEP and assigned placement.  For example, in D.C., the operative IEP called for a "seafood free environment" but, during her visit to the school cafeteria, the child's mother was informed it was not seafood free.  There, the court held the proposed placement inappropriate under the IDEA.  D.C., 950 F.Supp.2d at 509-11. Similarly, in B.R. ex rel. K.O. v. N.Y.C. Dep't of Educ., 910 F.Supp.2d 670 (S.D.N.Y. 2012), the IEP called for 1:1 occupational therapy but when the child's mother visited the proposed placement, the occupational therapist on staff informed her the school performed therapy at a ratio of one therapist to six students.  The mother, of course, rejected the proposed placement.  B.R., 910 F.Supp.2d at 676-77.  The court found the placement did not conform with the child's IEP and that the child had therefore been denied a FAPE.  Accordingly, the parent

was entitled to reimbursement for unilaterally placing her child in private school.

However, the presence of such "hard evidence" does not automatically invalidate a proposed placement.  In evaluating a parent's prospective challenge to a proposed placement before enrolling his or her child, a court must adhere to a second, related requirement: "a court may consider only the information that was available to the parents at the time that they rejected the recommended placement."  J.W., 2015 WL 1399842, at *9.  So-called "retrospective testimony"[5] discovered after this decision was made, should not be considered.  See Scott ex rel. C.S. v. N.Y.C. Dep't of Educ., 6 F.Supp.3d 424, 445 (S.D.N.Y. 2014) ("The proper inquiry for the Court ... is whether the alleged defects of the placement were reasonably apparent to the Plaintiff or the [DOE] when Plaintiff rejected [the placement].").  "[T]estimony from the [DOE] is permissible, but it must be limited to information that was reasonably known to the parties at the time of the placement decision."  D.C., 950 F.Supp.2d at 513.

---

[5] Retrospective testimony includes "testimony that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement."  R.E., 694 F.3d at 185.

The Court of Appeals addressed the limits on retrospective testimony in R.E.  In that case, the Court of Appeals adopted the majority view that an IEP "must be evaluated prospectively as of the time of its drafting" and held that "retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered ...."  R.E., 694 F.3d at 186.  Even so, the Court of Appeals rejected a "rigid 'four-corners' rule that would prevent a court from considering evidence explicating the written terms of the IEP."  Id. at 195.  "While testimony that materially alters the written plan is not permitted, testimony may be received that explains or justifies the services listed in the IEP."  Id. at 186.

### B. Application to G.E.

IDEA cases are necessarily fact-intensive—the "summary judgment" standard described above demands an independent review of the administrative record.  That is particularly true in cases like this one, where a parent's prospective challenge argues that a proposed placement would be unable to implement his or her child's IEP.  This raises thorny issues such as the "due weight" owed administrative findings, what constitutes "hard evidence," and where to draw the line between permissible and impermissible retrospective testimony.  All this, of course,

is done against the backdrop of providing an education for a disabled student—something all can agree is both vitally important and emotionally-charged.

### 1.   Deference to the IHO and SRO Decisions is Appropriate

It is precisely because of the difficulty in navigating these legal and factual issues that "[t]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." Gagliardo, 489 F.3d at 112. Indeed, the IDEA's express purpose is to provide funding to states so that they can provide education for disabled students. M.H., 685 F.3d at 244 (internal citations omitted). In New York, dual-layered IHO and SRO review functions as a check on that process, providing allegedly aggrieved parents an avenue for review and, potentially, redress. Deference to IHO and SRO decisions is not automatic; rather, as outlined above, precedential value hinges on quality of reasoning, familiarity with the evidence, and other factors taken into consideration when courts review any judgment. See M.H., 685 F.3d at 244. Here, Plaintiff argues that the IHO and SRO decisions were not "thorough and well-reasoned" and, accordingly, should not be afforded deference. (See Pl.'s Mem. of Law in Opp. to Defs.' Cross-Mot. for Summ. J. and

Reply in Further Support of Pl.'s Mot. for Summ. J., dated
Feb. 13, 2015 [dkt. no. 22] ("Pl.'s Reply"), 8-10.)

        The Court disagrees.  As a preliminary matter, the
Court notes that, in the cases Plaintiff cites to support her
argument that deference to the SRO's decision is not warranted,
there was disagreement between the IHO and SRO.  In F.O. v.
N.Y.C. Dep't of Educ., 976 F.Supp.2d 499, 520 (S.D.N.Y. 2013),
the Court found the SRO decision to be inadequately reasoned and
instead reverted to what it determined to be a well-reasoned and
well-supported IHO decision, which had reached a different
outcome.  Likewise, in M.H., the Court of Appeals affirmed both
the district court's finding that the SRO decision was
inadequately reasoned and its corresponding reliance on the
operative IHO decision which, as in F.O., had reached a
different conclusion from the SRO.  See M.H., 685 F.3d at 231.
Here, the IHO and SRO both found in favor of the DOE; there is
no divergence between the two.  Moreover, the district court
should afford more deference where, as here, "its review is
based entirely on the same evidence as that before the SRO."
Id. at 244.  Finally, Plaintiff's rationale for why the SRO's
decision was not thorough and well-reasoned misses the mark.
(See Pl.'s Reply at 8-10.)  The SRO's decision rejects
Plaintiff's appeal because it finds her claims legally
speculative.  (See SRO Decision at 9-11)(citing, among others,

R.E., 694 F.3d at 186).  The SRO's analysis of whether P.S. 373
could have executed the May 2013 IEP is a hypothetical exercise
unnecessary to its overall conclusion.  For those reasons, in
addition to the well-settled legal standard, this Court grants
deference to the findings of the IHO and SRO.

> 2.    There is No "Hard Evidence" that P.S. 373
> Could Not Have Implemented the May 2013 IEP

Plaintiff cites what she argues are two pieces of
"hard evidence" that the assigned placement could not implement
G.E.'s IEP.  (See Pl.'s Reply 4-8.)  For the reasons below, the
Court finds that neither rises to the level of factual
incapability articulated in N.S. and present in D.C. and B.R.

First, Plaintiff argues that her testimony regarding
her conversation with Gambino-Dinneny amounts to the school's
informing Plaintiff of its plans to contravene the IEP.  (Pl.'s
Reply 4-5.)  In particular, Plaintiff points to her testimony
that Gambino-Dinneny "told [Plaintiff] that [Gambino-Dinneny]
didn't feel that the [proposed placement] was appropriate for
[G.E.]" and also that "there were other programs that would be
more appropriate."  (Tr. at 117.)  Plaintiff requests that the
Court consider this evidence undisputed under Fed. R. Civ. Pr.
56(e).  (Pl.'s Reply 5-6.)  Even if the Court were inclined to

do so—which it is not[6]—this testimony still does not constitute "hard evidence" that the proposed placement was "factually incapable" of implementing the IEP.  This was not akin to proposed placement's cafeteria not being seafood-free when the child's IEP specifically promised a "seafood free environment," as in D.C., nor was it like an assigned school offering therapist-student class ratios in direct contravention of the IEP, as in Scott and B.R.  Plaintiff's testimony, even if accepted as unchallenged, merely evidences Gambino-Dinneny's belief that, given G.E.'s personality and, critically, what Plaintiff "wanted [G.E.] to achieve," perhaps other placements were more appropriate.  (Tr. at 117.)  Here, the Court must be mindful of the overarching standard: Rowley mandates a "basic floor of opportunity," Rowley, 458 U.S. at 189-90, not the best possible education.  While this Court—like the SRO (see SRO Decision at 16)—understands and, indeed, empathizes with a

---

[6] Defendants specifically rebut Plaintiff's alleged "uncontroverted fact."  (See Reply Mem. of Law in Further Support of Defs.' Cross-Mot. for Summ. J. and in Further Opp. To Pl.'s Mot. for Summ. J., dated Feb. 27, 2015 [dkt. no. 23], 6 n.1; Answer, dated July 15, 2014 [dkt. no. 6], ¶¶ 43, 44.) Moreover, as noted by the SRO, "[e]ven if ... [Gambino-Dinneny] expressed to [Plaintiff] during her visit ... that the school was not appropriate for [G.E.] ... [Gambino-Dinneny] did not have a copy of [G.E.'s IEP]" and had neither met G.E. nor attended a CSE meeting for her.  (See SRO Decision at 15 n.8.) Accordingly, it was not reasonable for Plaintiff to rely on Gambino-Dinneny's alleged assessment over that of the individuals who had attended the CSE and developed G.E.'s IEP. (Id. at 15-16 n.8.)

parent's desire to obtain the best education for his or her
child, that is not what the law mandates.

The Court need not consider Gambino-Dinneny's
testimony regarding this conversation to reach its conclusion.
However, the Court does find her testimony permissible under
R.E.; further, the Court finds this testimony buttresses the
Court's conclusion that Plaintiff has not met N.S.'s standard to
be reimbursed for prospectively rejecting a proposed placement.
Plaintiff is correct in her assertion that R.E. bans certain
retrospective testimony.  Gambino-Dinneny's testimony on the
appropriateness of the proposed placement is not the type barred
by R.E.; rather, it is precisely the sort of testimony "that
explains or justifies the services listed in the IEP" that R.E.
explicitly allows.  R.E., 694 F.3d at 186.  Gambino-Dinneny's
testimony served to clarify her conversation with Plaintiff,
explaining what she likely meant by "appropriate" and
"alternative sites."  (Tr. at 45.)  Moreover, this testimony was
elicited by a specific question posed by Plaintiff's counsel
and, functionally, serves as a counterweight to Plaintiff's
recollected account of the conversation.  In sum, though the
Court does not rely on Gambino-Dinneny's testimony clarifying
her conversation with Plaintiff, it finds that the testimony is
(1) permissible under R.E. and (2) lends further support to the

Court's conclusion that P.S. 373 did not, as Plaintiff argues, clearly state its intention to contravene the IEP.[7]

Second, Plaintiff argues that P.S. 373's self-contained 6:1:1 classroom did not conform with the IEP because it did not allow for G.E. to interact with typically-developing peers. (Pl.'s Reply at 6-8.) While it is clear Plaintiff believed this was important to G.E.'s development, such social interaction was not mandated by the IEP. The IEP mandated, among other requirements, placement in a specialized school and various related services. (B:12-13, 15; SRO Decision at 3.) It merely noted that "[w]ith appropriate adult supervision, [G.E.] is able to participate in extracurricular and other nonacademic activities with typically developing peers." (B:14.) This is not a requirement, and the assigned placement in a self-contained classroom does not contravene the IEP.

Plaintiff has therefore failed to prove that G.E.'s is one of the "few circumstances" in which a parent can, even where there is an adequate (and here, unchallenged) IEP, successfully challenge placement if his or her child never attended the school. Plaintiff fails to offer "hard evidence" that

---

[7] The Court need not, and does not, reach the question of whether certain other of Gambino-Dinneny's testimony—particularly the portion regarding P.S. 373's hiring of additional professionals after Plaintiff rejected placement—is impermissibly retrospective.

demonstrates the assigned placement was "factually incapable" of implementing the IEP.  Moreover, both the IHO and SRO reached the same conclusion, and deference to those decisions is warranted.

Accordingly, because the Court holds for the DOE on the first prong of Burlington/Carter—that the DOE provided G.E. a FAPE for the 2013-2014 school year—it need not consider whether (1) G.E.'s placement at Seton was appropriate and (2) whether equitable considerations affect relief.  It follows that the Court need not, and does not, address the IHO and SRO analysis of whether the assigned placement could have implemented the IEP.  This decision properly does not rest on that hypothetical determination, and undertaking such an analysis is therefore unnecessary.

V.    CONCLUSION

        For the reasons above, the Court GRANTS Defendants'
motion [dkt. no. 20] and DENIES Plaintiff's motion [dkt. no.
14].  The Clerk of Court is directed to enter judgment for
Defendants, terminate dkt. nos. 14 and 20, and close the case,
marking any pending motions denied as moot.


SO ORDERED.

Dated:    New York, New York

          July 2, 2015


                              _Loretta A. Presley_

                              LORETTA A. PRESKA

                              Chief United States District Judge